# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *ex rel.* K & R LIMITED | ) |
| PARTNERSHIP, | ) |
| | ) |
| Plaintiff-Relator, | ) |
| | ) |
| v. | )    Civil Action No. 99-1343 (RCL) |
| | ) |
| MASSACHUSETTS HOUSING | ) |
| FINANCE AGENCY, | ) |
| | ) |
| Defendant. | ) |

_____)

## MEMORANDUM OPINION

This matter comes before the Court on the Motion [74] for Summary Judgment by plaintiff-relator K&R Limited Partnership ("K & R") and the Motion [75] for Summary Judgment by defendant Massachusetts Housing Finance Agency ("MHFA"). Also before the Court are MHFA's Motion [90] to Strike the Affidavit of Robert Ercolini and K&R's Motion [93] to Strike Exhibit A to MHFA's Reply. Upon consideration of the motions, the oppositions thereto, the briefs in reply, the applicable law, and the entire record, the Court has concluded that both Motions to Strike will be denied, that K&R's Motion for Summary Judgment [74] will be denied, and that MHFA's Motion for Summary Judgment [75] will be granted. Accordingly, an appropriate order was issued on September 29, 2006, granting summary judgment in favor of defendant on all of plaintiff's claims, which are dismissed with prejudice, and entering judgment in favor of defendant. The Court's reasoning is set forth below.

I.      FACTS

The federal Department of Housing and Urban Development ("HUD") conducts several programs to help provide affordable housing to lower income families, and among these is the non-insured "236 Program," so named because it was authorized by Section 236 of the National Housing Act.  12 U.S.C. § 1715z-1.  Under the Program, the owner of a housing project offers some or all of the units in the project to lower income families at affordable rental rates.  When certain requirements are met, these units then qualify for mortgage assistance from HUD.  The project owner obtains a mortgage loan to finance the construction or rehabilitation of the project, secured by a mortgage on the property.

At the same time, HUD makes monthly payments to the mortgage lender, or mortgagee, to reduce the project owner's obligation.  This debt service subsidy is called an "Interest Reduction Payment."[1]  The amount of the HUD payment is equal to the difference between the monthly mortgage loan payment – taking into account payments for principal, interest, and certain allowable fees – and what the mortgagor's payment would be if the interest rate on the loan was 1 percent.  12 U.S.C. § 1715z-1(c).[2]  In other words, the project owner obtains a mortgage loan on the open market but makes payments on it as if the interest rate was 1 percent, and HUD picks up the monthly difference.  This mortgage assistance makes it possible for the project owner to offer units at rates that are affordable to lower income families, who are the

---

[1]This is a bit of a misnomer, since the HUD subsidies reduce the amounts due on both principal and interest.

[2]In some cases a project owner will set aside less than all of the units in a project for affordable housing.  In that event HUD's payments will be calibrated to the number of units eligible for assistance under the 236 Program.

ultimate and intended beneficiaries of the Program.

The Massachusetts Housing Finance Agency ("MHFA") has acted as a mortgage lender for dozens of projects that participate in the 236 Program.  MHFA was established by the Massachusetts Legislature in 1966, and its purpose is to "raise funds from private investors in order to make low interest rate funds available for the acquisition, construction, adaptation and rehabilitation of housing designed to meet the needs of physically or mentally handicapped individuals and their families, insure residential or construction or permanent or rehabilitation loans for community based residences, and provide technical assistance to low income persons and families applying for residential loans and to sponsors of community based residences." Mass. Gen. Laws ch. 23A App § 1-2 (2000).  K&R is a limited partnership organized under the laws of Massachusetts.

For each project, the owner of the project, HUD, and MHFA executed either an "Interest Reduction Contract" or an "Agreement for Interest Reduction Payments."  These agreements are substantially similar and govern, among other things, the manner in which HUD will calculate its monthly interest payments.  As will be seen below, these agreements do not establish a set interest rate, but rather refer the parties to the underlying mortgage agreement, which itself supplies the interest rate or method for calculating it.  K&R's Amended Complaint refers to 66 different housing projects that participate in HUD's 236 Program or did participate in it as of February 1993, and which were built or substantially renovated under the Program.  While construction or renovation was ongoing, MHFA provided interim financing for these projects, usually through the issuance of short-term, tax-exempt Bond Anticipation Notes ("BANs").  When construction or rehabilitation was complete and a project was certified for occupancy,

MHFA provided long-term financing for the projects with funds raised through the issuance of tax-exempt bonds.  It was only at this time, when permanent, long-term financing was put in place, that the project owner's loan was amortized, and it was at this time that HUD began making interest reduction payments.

For each loan made by MHFA to the owner of a project, the owner executed a mortgage note setting forth the terms of the loan, such as the loan amount, the interest rate, and the loan term.  To secure the loan, each project owner executed a mortgage in favor of MHFA.  In some instances MHFA also provided supplemental funding after the first mortgage loan was made.

Each month, MHFA submits to HUD a request for interest reduction payment for each of the 236 Program projects that it finances.  Each request is submitted on an invoice called a "Form HUD-3111," titled "Mortgagee's Certification and Application for Interest Reduction Payments." When MHFA's representative signs the form, that representative "certifies to the best of his knowledge and belief" that, among other things, "each interest reduction payment included in this billing has been calculated in accordance with the provisions of the Interest Reduction Contract" and that "the amount of this billing is true and correct and has not been previously claimed or paid."  *See* K&R's Mem. in Support of Motion for Summary Judgment [74], Ex. 2. In addition, MHFA submits supplemental material with each Form HUD-3111 to document the information provided on the Form.

MHFA financed most of its mortgage loans from the proceeds of bond issuances.  Many of the 66 projects whose mortgages are at issue in this case were originally financed from the proceeds of bonds issued in the 1970s.  In 1993, MHFA refunded these bonds – that is, it bought them back and retired them – using the proceeds of new bonds it had issued at substantially lower

interest rates.  MHFA thus was able to obtain substantial savings on the cost of its financing.
The project owners continued to make the same payments to MHFA on their mortgages, MHFA
continued to submit the same monthly requests for interest reduction payments to HUD, and
HUD continued to make the same payments to MHFA.

On March 27, 1999 plaintiff-relator K&R Limited Partnership filed a complaint under
seal pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730, *et seq.*,
("FCA"), alleging that MHFA submitted false claims for payment to HUD each month beginning
in April of 1993.  K&R claimed that when MHFA issued the 1993 bonds – with interest rates
lower than those for the bonds originally used to finance the 66 projects under the 236 Program –
MHFA was required to lower the interest rates due under its mortgages, and thus the amount of
interest reduction payment it could claim from HUD.  According to K&R, MHFA's failure to
lower the interest rates meant that they had not "been calculated in accordance with the
provisions of the Interest Reduction Contract," as certified by the Form HUD-3111.  MHFA thus
submitted false claims for payment, claims which asserted that MHFA was entitled to
substantially more in interest reduction payments than was actually the case.

The United States declined to exercise its right to intervene and the complaint was
unsealed and served on MHFA.[3]  On July 30, 2001, this Court denied MHFA's motion to dismiss

---

[3]The United States did submit a "Statement of Interest" [84], in which it did not express
an opinion on the merits but did address several legal arguments raised by MHFA.  Specifically,
the United States argued that: (1) "a reasonable but incorrect interpretation by defendant of its
contractual obligations does not preclude a finding that defendant "knowingly" violated the
FCA"; (2) "evidence of government knowledge" of an allegedly false claim "pertains to the
scienter element of the FCA," but does not automatically preclude FCA liability; and (3) "HUD's
alleged failure to pursue alternate remedies or cease, reduce or recover excessive subsidy
payments is irrelevant to defendant's liability under the FCA."  This Court's holding is consistent
with these points, except to note that HUD's acquiescence to MHFA's requests for interest

for failure to state a claim.  The parties have engaged in discovery, and both have moved for

summary judgment.  K&R moves for summary judgment on the first two prongs of FCA liability,

that MHFA submitted claims and that these claims were false.  K&R contends there are disputed

fact issues on the remaining prong, MHFA's scienter.  MHFA contends that it is entitled to

summary judgment on the grounds that its claims were not false and, even if they were, were not

submitted with the requisite knowledge or intent.

## II.    Motions to Strike

Also before the Court are two motions to strike exhibits submitted by the parties.  MHFA

moves to strike [90] an affidavit submitted by K&R with its brief opposing summary judgment,

while K&R moves to strike [93] a demonstrative chart submitted with MHFA's reply brief in

support of summary judgment.

Federal Rule of Civil Procedure 12(f) allows a court to strike all or part of a

pleading for insufficiency, redundancy, immateriality, impertinence, or scandalousness.  *See* Fed.

R. Civ. P. 12(f).[4]  A matter is immaterial or impertinent when not relevant to the resolution of the

issue at hand.  *Judicial Watch, Inc. v. Dep't of Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004).

Material is "scandalous" if it "generally refers to any allegation that unnecessarily reflects on the

moral character of an individual or states anything in repulsive language that detracts from the

dignity of the court."  2 Moore's Federal Practice § 12.37[3], at 12-97 ("Moore's").  These

---

reduction payments does have some relevance on the issues of falsity and scienter, though it
cannot alone preclude liability.

[4]For purposes of the Rule, the term "pleading" includes affidavits and other materials in
support of technical pleadings.  *See Larouche v. Dep't of the Treasury*, 2000 U.S. Dist. LEXIS
5078 at *39-40 (D.D.C. Mar. 31, 2000); citing *Humane Soc'y of the United States v. Babbitt*, 46
F.3d 93, 97 n.5 (D.C. Cir. 1995).

motions are strongly disfavored, and the decision of whether to strike all or part of a pleading or attachment thereto rests within the sound discretion of the court. *See Judicial Watch*, 224 F.R.D. at 263 (collecting authorities).

A court may also strike all or part of an affidavit for failing to satisfy the requirements of Federal Rule of Civil Procedure 56(e), which states:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed. R. Civ. P. 56(e).

### A.    *The Ercolini Affidavit*

MHFA filed a Motion [90] to Strike the Affidavit of Robert Ercolini, submitted by K&R as an exhibit to its opposition brief.  MHFA contends that the bulk of the affidavit: (1) contains impermissible opinion testimony from an individual who was not disclosed as an expert; (2) is not based on personal knowledge; and (3) relies largely on impermissible hearsay evidence. Prior to filing the motion, MHFA's counsel contacted K&R's counsel by email on June 6, 2006, stating that MHFA would move to strike the Ercolini affidavit if K&R did not respond within 24 hours.  When K&R's counsel, whose reply brief in support of summary judgment was due on June 7, failed to respond within the allotted 24 hours, MHFA filed a motion to strike on the evening of June 7.  While K&R counters the motion by arguing that Ercolini's affidavit is admissible because it is based on his personal knowledge acquired by investigating MHFA, K&R also argues that MHFA's motion should be denied because MHFA failed to comply with Local Civil Rule 7(m).

Local Civil Rule 7(m) requires that, "[b]efore filing any nondispositive motion in a civil

action, counsel shall discuss the anticipated motion with opposing counsel, either in person or by telephone, in a good-faith effort to determine whether there is any opposition to the relief sought and, if there is opposition, to narrow the areas of disagreement." LCvR 7(m).  The Rule also requires that a party "shall include in its motion a statement that the required discussion occurred, and a statement as to whether the motion is opposed." *Id.*  A nondispositive motion that does not comply with the Local Rule will be denied. *Alexander v. FBI*, 186 F.R.D. 185, 187 (D.D.C. 1999).  The purpose of the Rule is to facilitate the informal resolution of disputes without court intervention, or "at least to reduce or narrow the issues the Court will consider." *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 235 F.R.D. 521, 529 (D.D.C. June 2, 2006).  Because the Rule seeks to promote actual resolution of nondispositive disputes, its focus is on substance, not form, and thus "[t]he obligation to confer may not be satisfied by perfunctory action, but requires a good faith effort to resolve the nondispositive disputes that occur in the course of litigation." *Id.*

MHFA failed to put forth such an effort.  While the Local Rule would not require that MHFA wait in vain on an evasive party, it at least "contemplates that counsel will speak to each other." *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 194 (D.D.C. 2003).  No such conversation occurred, and MHFA made only the most cursory attempt to see that one did. Indeed, the language of MHFA's email suggests that MHFA had already assumed what the outcome of such a discussion would be and viewed a conference as unnecessary.  Moreover, the email effectively gave K&R one business day to respond, even though the Ercolini Affidavit had been on the docket for a full month.  Had MHFA's counsel taken real steps to confer with K&R's counsel, such as contacting K&R's counsel by telephone or within a reasonable period prior to

filing the motion, the parties may have been able to resolve or at least narrow the issues that the

motion presents.  For instance, a simple phone call, even if made at the last minute, may have

revealed what K&R conceded in its opposition to the motion to strike; that certain parts of the

affidavit may indeed be inadmissible.  Because MHFA merely genuflected to the letter of the

Rule instead of trying in good faith to achieve its objectives, its motion to strike is denied.[5]

## B.    Exhibit A to MHFA's Reply

K&R moves to strike Exhibit A to MHFA's reply brief in support of summary judgment.

The exhibit is a 57-page table consisting of three columns, in which MHFA sets forth the 103

paragraphs from its Statement of Undisputed Material Facts in one column, K&R's response to

each paragraph in the second column, and MHFA's "Comments" in the third.  The "Comments"

are cribbed from MHFA's reply and represent its argument as to why MHFA's account of the

facts, when stacked up against K&R's, supports summary judgment for MHFA.  K&R argues

that this is an attempt to evade the local 25-page limit for reply briefs by loading additional

argument into the exhibit.  *See* LcvR 7(e).

As MHFA points out, for the most part Exhibit A does not present any information or

argument that is not contained in MHFA's reply; it is simply the same argument from the reply

presented in a different manner.  The chart sets out the parties' factual contentions in order, and

then lists points from MHFA's reply brief next to the applicable factual contentions.  This is

---

[5]MHFA asserts that Rule 7(m) may not even apply to its Motion to Strike, since the motion was submitted in connection with MHFA's summary judgment motion and is therefore dispositive.  MHFA's half-hearted attempt to comply with the rule suggests that even it is not persuaded by this argument.  The motion to strike is nondispositive.  No matter how the Court were to rule on the motion, its ruling would not dispose of the case or any of the issues for which summary judgment has been moved.

organizational work that the Court would otherwise have to take upon itself, and it does not appear to have been an attempt by MHFA to evade any of this Court's rules.

MHFA has combed through its chart and identified only five entries that arguably were not presented in its reply brief, and thus would be argued for the first time in the chart. K&R does not identify any concrete way in which it would be prejudiced by admission of the exhibit. The fact that the chart consists overwhelmingly – or perhaps entirely – of information and argument presented elsewhere in the parties' various submissions supports the notion that the chart was submitted in good faith as a demonstrative exhibit, not as part of a bad faith effort to evade and undermine the purpose of the Local Rules. A "motion to strike is considered an exceptional remedy and is generally disfavored," *Larouche v. Dep't of the Treasury*, 2000 U.S. Dist. LEXIS 5078 at *40 (D.D.C. Mar. 31, 2000) (citing Moore's at § 12.37[1]), and the proponent of such a motion must shoulder a "formidable burden." *Judicial Watch, Inc. v. Dep't of Commerce*, 224 F.R.D. 261, 264 (D.D.C. 2004). K&R has failed to meet that burden here, and its motion to strike is therefore denied.

## II.    Summary Judgment

### A.    Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment when the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue over a material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A disputed

10

issue of material fact is genuine and therefore precludes summary judgment where the Court determines that a reasonable jury could conceivably find in favor of the non-moving party on that factual issue. *Anderson*, 477 U.S. at 248. But even where a genuine issue exists as to some material fact, the movant is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

As a general rule, when adjudicating a motion for summary judgment, the Court must "assume the truth of all statements proffered by the party opposing summary judgment" and construe all evidence in favor of the non-moving party. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). *See Anderson*, 477 U.S. at 255; *Carter v. Greenspan*, 304 F. Supp. 2d 13, 21 (D.D.C. 2004). Indeed, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). *See also Washington Post Co. v. United States Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). However, "some statements are so conclusory as to come within an exception to" the general rule that the non-movant's statements must be fully credited when adjudicating a motion for summary judgment. *Greene*, 164 F.3d at 675 (citing as examples *Delange v. Dutra Constr. Co.*, 153 F.3d 1055, 1058 (9th Cir. 1998); *Lefkowitz v. Citi-Equity Group, Inc.*, 146 F.3d 233, 240 (5th Cir. 1998)). Thus "wholly conclusory statements for which no supporting evidence is offered" need not be taken as true for summary judgment purposes. *Carter*, 304 F. Supp. 2d at 21 (citing *Greene*, 164 F.3d at 674–75).

In order to survive a motion for summary judgment, the non-moving party must establish

more than the "mere existence of a scintilla of evidence" in support of its claims. *Anderson*, 477

U.S. at 252.  In order to prevail, the non-movant's opposition must contain more than

"unsupported allegations or denials and must be supported by affidavits or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial." *Carter*, 304

F. Supp. 2d at 21.  *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.  "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477

U.S. at 249–50.  In fact, summary judgment may issue where the movant points to a substantial

lack of evidence in the non-movant's case; *see Celotex*, 477 U.S. at 322; or where the movant

demonstrates that the non-movant has failed to proffer "evidence on which the jury could

reasonably find for" the non-moving party.  *Anderson*, 477 U.S. at 252.

### B.    False Claims Act Liability

The False Claims Act ("FCA") aims to protect the federal fisc from false or fraudulent

claims.  31 U.S.C. §§ 3729-3733.  It does so by providing liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the
> United States Government . . . a false or fraudulent claim for payment or approval;
> [or] (2) knowingly makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a).

There are three elements to FCA liability: (1) defendant submitted a claim to the

government; (2) which was false; and (3) which the defendant knew was false.  *See, e.g., United*

*States ex rel. Harris v. Bernad*, 275 F.Supp. 2d 1, 6 (D.D.C. 2003).  In this case there is no

dispute that each Form HUD-3111 submitted by MHFA is a "claim" under the FCA.  The Act

defines a "claim" as:

12

any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  31 U.S.C. § 3729(c).

The Form HUD-3111 is clearly a request for money from the government.  Given that MHFA submitted claims, at issue are the other two prongs under the FCA: (1) Were the claims false?  and, if they were, (2) Did MHFA knowingly submit false claims?

## 1.      Falsity

The plaintiff-relator bears the burden of establishing that the claim or statement submitted to the government was false.  *United States ex rel. Ervin & Assocs., Inc. v. The Hamilton Secs. Group, Inc.*, 370 F.Supp. 2d 18, 44 (D.D.C. 2005).  The falsity of the Form HUD-3111 can be determined only by reference to other documents.  This is because when MHFA's representative signs the form, that representative "certifies to the best of his knowledge and belief" that "each interest reduction payment included in this billing has been calculated in accordance with the provisions of the Interest Reduction Contract."  *See* K&R's Mem. in Support of Motion for Summary Judgment [74], Ex. 2.

When a case turns on the meaning of an unambiguous contract, summary judgment is appropriate, because "no citation of authority is necessary to establish the proposition that the construction of written instruments is a question of law for the court."  *Noel v. Baskin*, 131 F.2d 231, 233 (D.C. Ct. App. 1942); *see also Echo, Inc. v. Whitson Co.*, 52 F.3d 702, 705 (7th Cir. 1995) ("Contract interpretation is particularly suited to disposition by summary judgment."); *Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed. Cir. 1996) (summary judgment is

13

"appropriate where the sole dispute concerns the proper interpretation of a public contract, a question of law.").

As stated, the HUD Form-3111 refers the parties to the Interest Reduction Contract.  The Interest Reduction Contract, employed by developers for 31 of the 66 projects, states, in relevant part, that:

> 1. [. . . .] The interest rate payable by the Mortgagor to the Mortgagee, upon which subsidies will be computed hereunder, except as hereinafter stated, shall consist of the rate which the Mortgagee pays from time to time on notes and bonds which it issues to fund or refund the loan, calculated on the unpaid balances, plus additional interest of ½% calculated on the aforesaid face amount of the mortgage loan . . .
> 2. With respect to the assisted units in the project, which are shown on Exhibit B hereof, the Commissioner shall make monthly interest reduction payments to the Mortgagee in amounts equal to the difference between:
>> (a) the monthly payments, computed on an annual basis, for principal, if any, attributable to the assisted units, and interest attributable to the assisted units, which the Mortgagor is obligated to pay under the project mortgage; and
>> (b) an even monthly payment, computed on an annual basis, for principal, if any, attributable to the assisted units, and interest attributable to the assisted units, based upon an assumed amortization period of 40 years, which the Mortgagor would be required to pay if the project mortgage were to bear interest at the rate of 1% per annum;
>
> and provided finally, that at the time permanent financing is arranged by the Mortgagee for the project, the amount computed under subsection (a) above upon which the aforesaid "difference" is based, shall be recomputed, subject to the availability of funds, to reflect the rate of interest paid by the Mortgagee on its permanent loan."

Rupp Aff., Ex. 2 at MHFA00007.  Docket 75-1 ¶ 31.  In the mid-1970s each Interest Reduction Contract was amended to change the last instance of "Mortgagee" to "Mortgagor."  *Id.* at ¶ 32 (emphasis added).

The agreement thus sets forth in the first clause that, prior to the time at which permanent

financing is arranged, the mortgagor's interest rate is pegged to the rate on MHFA's source of financing. But the second clause recognizes that financing proceeds in steps, with the last step being "the time permanent financing is arranged by the Mortgagee for the project." At that time, the interest is "recomputed" based on the interest paid on the "permanent loan." The interest rate, and the allowable HUD subsidy, are thus to be found in the documents that set forth the "permanent loan," in other words, the note for the "project mortgage."

In some instances the parties used a different agreement, the Agreement for Interest Reduction Payments, which uses simpler terms to achieve the same effect. A typical such agreement states that monthly HUD subsidies will be based on the difference between the monthly payment "which the Mortgagor is obligated to pay under the development loan," which is the loan from MHFA to the project owner. Rupp. Aff., Ex. 4, at MHFA00097-98. Both forms of agreement therefore state that the allowable subsidy is based on the monthly payment due under the relevant mortgage note.

So, in other words, the Form HUD-3111 points us to the three-party Interest Reduction Contract (or its equivalent), which tells us that HUD subsidies are to be based in part on the interest paid on the mortgage loan, as established by the mortgage note. So in simple terms, if the mortgage notes required that interest rates be reduced after the 1993 bond issuance, and MHFA failed to do so, it requested more from HUD than it was entitled to, and its claims were false. The Court turns now to the mortgage notes.[6]

---

[6]MHFA argues that its claims cannot be false because its interpretation of the notes, even if incorrect, was objectively reasonable. The reasonableness of MHFA's interpretation goes to the scienter prong, not falsity. The cases cited by MHFA establish that where "a contractor submits a claim based on a plausible but erroneous contract interpretation, the contractor will not be liable, absent some specific evidence of knowledge that the claim is false or of intent to

The notes were executed in Massachusetts and are governed by Massachusetts law.  *See,*

*e.g.*, *New England Machinery, Inc. v. Conagra Pet Products Co.*, 827 F.Supp. 732, 735 (M.D.

Fla. 1993) (matters concerning interpretation of contract are governed by law of forum in which

it was executed).  The Court construes contracts in a manner that gives effect to the words used

by the parties, and assumes that the parties intend every part of a contract to mean something, "so

that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or

nugatory."  *Air Line Pilots Assoc., Int'l v. Pension Benefit Guaranty Corp.*, 193 F.Supp. 2d 209,

218 n.4 (D.D.C. 2002) (citation omitted); *see also National Shawmut Bank of Boston v. Joy*, 53

N.E.2d 113 (Mass. 1944).

The 99 mortgage notes at issue can be grouped into three rough categories.  The first two

categories of notes use different language to set forth the same general method for calculating

interest on the mortgage loans: while the project was on temporary financing, the rate would vary

to reflect the interest paid by MHFA on the different short-term financing instruments it might

use at different times to fund the loan, but when the loan went to long-term, permanent financing

and was amortized, the interest rate would be adjusted one last time to reflect the interest rate on

bonds that MHFA issued at that time or at some point in the past.  The third category of notes is a

catchall category of substitute or superseding mortgage notes with one thing in common: they

explicitly identify some or all of their interest rates.

---

deceive."  *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998).
This only goes to show that a contractor cannot be held liable simply for being wrong about a
contract's meaning, without evidence that he knew he was wrong or recklessly disregarded signs
that he might be.  One wrong interpretation of a contract may be more plausible and thus more
reasonable than another wrong interpretation, but they are both wrong and claims based on either
would be false.

**Type 1 Notes**

The first type of note ("Type 1") is similar to the mortgage note for the Brookline Village project.  This note provides for a temporary "Initial Interest Rate" that may vary, and envisions that the interest rate will be fixed once permanent financing is established.  The note states, in pertinent part:

> "provided, however, that on Termination Date of the Initial Interest Rate, the interest rate shall from time to time be adjusted upward or downward, as the case may be, and computed at a rate equal to one-half of one percent (½%) per annum in excess of the net interest cost paid by the Payee on notes used to fund or refund the loan evidenced by this Note, and provided the interest shall be further adjusted upward or downward, as the case may be, so that commencing on the date on which Payee issues bonds, the interest per annum shall be computed by adding:
>
> (a) interest on the unpaid balance hereof at a rate equal to the net interest cost which the Payee is required to pay from time to time on bonds to fund or refund the loan evidenced by this Note, and
>
> (b) an amount equal to one-half of one percent (½ %) of the Principal Amount of this Note set forth above."

Brookline Village, July 31, 1975 Joint Stip. Ex. 12.

This note provides that the interest rates may vary during the time that temporary financing is in place, because the source and cost of MHFA's financing may vary during this ad hoc, transitional period.  But when permanent financing is put in place ("commencing on the date on which Payee issues bonds"), the interest rate will thereafter be based on the rate MHFA "is required to pay from time to time on bonds to fund or refund the loan evidenced by this Note." That interest rate is set at the time that MHFA "fund[s] or refund[s] the loan," when the mortgage is amortized and the project goes to permanent financing with a set term.

MHFA and the project owners would have used different language if they had wanted to

create a variable interest rate that would continue to change after permanent financing was

established.  But the language they did use establishes that a permanent, fixed rate will be set

when the project goes to permanent financing.  While the project is on temporary financing, the

interest rate "shall from time to time be adjusted upward or downward" to reflect MHFA's

borrowing costs.  But when the project goes to permanent financing, the interest rate simply

"shall be further adjusted upward or downward."  This slight difference in language captures a

real difference in practice: temporary financing is based on the periodic issuance of notes, but

once permanent financing is in place, the interest rate is not adjusted "from time to time," but is

adjusted once, to the fixed rate it will maintain over the life of the loan.

### Type 2 Notes

For many projects, the parties used the second type of mortgage note, a "Substitute

Mortgage Note" ("Type 2"), which typically replaced a Type 1 note when a mortgage increase

was made or when permanent bond financing had been put in place for the original loan.  Type 2

notes usually contained an "Attachment A," an appendix that explicitly stated the exact, fixed

interest rate on the original loan.  As for the interest rate on the mortgage increase, the Type 2

notes identify two phases of financing.  Paragraph 1 states that in the period "[p]rior to the

Agency's issuance of its Funding Bonds," the interest rate will be pegged to MHFA's borrowing

costs.  The "Funding Bonds" are defined as "the bonds issued by the Agency and designated by it

to fund this loan or to refund the bond anticipation notes from time to time issued by the Agency

and designated by it to fund the loan evidenced by this Note."  Once the "Funding Bonds" are

issued, interest is calculated by adding one half of one percent to "the interest cost incurred by

the Agency on the Funding Bonds."  Joint Stip. 78.

Just like the Type 1 notes, the Type 2 notes envision temporary and permanent phases of financing. They do not envision any other step after the bonds are issued and the project goes to permanent financing. Under the Type 2 notes, MHFA even designates which bond supplies the interest rate. Both note types establish that the interest rate on the loan will be based on a specific bond issuance. Neither note says anything about subsequent bond issuances or MHFA's cost of *other* borrowing. The notes do not contemplate that the interest rate will be adjusted from time to time once permanent financing is in place.

In defense of its interpretation, K&R points to the following language contained in some of the notes: "[t]he Borrower shall in all events pay the entire amount outstanding . . . upon the earlier of the final maturity of the Funding Bonds or the Maximum Note Term . . ." *See* Jt. Stip. Ex. 44; Plaintiff's Mem. in Support of Motion for Summary Judgment [74-2]. K&R argues that when certain "Funding Bonds" were redeemed during the 1993 bond issuance, these bonds hit their "final maturity." Since none of the mortgage notes were called in, the only logical explanation, K&R argues, is that the 1993 bonds replaced the prior bonds as the "Funding Bonds." This is not a logical reading of this provision. The maturity date of a bond is a date certain, regardless of whether the bond survives to see it. If a bond is paid off and retired before that date is reached, the bond has not reached maturity. This is likely why the notes are phrased in the disjunctive – since the bonds will not reach final maturity, the "Maximum Note Term" becomes the operative time period.

If K&R's interpretation is correct, the Type 1 and Type 2 notes say both too much and too little. If the interest rates on the mortgages were supposed to vary depending on MHFA's cost of borrowing, then the parties could have said so by making slight changes to the clause that

described the temporary financing phase.  But both types of note contain additional clauses

describing the method for setting the interest rate once a project goes to permanent financing.

The parties clearly distinguished between a phase of variable rates and a phase with a fixed rate,

but K&R would have the contracts establish only variable rates tied to MHFA's borrowing costs

– a concept the parties could easily have expressed.  Under K&R's theory, the notes make a

distinction without a difference, and the parties wasted many words to say what could have been

expressed in one clause.  The Court strives to give each term of a contract independent meaning,

so that no word or clause is rendered nugatory.  While MHFA's interpretation gives effect to

each term of the notes, K&R's would render whole clauses as either surplus or nonsense.

At the same time, if the parties had intended to effectuate the intention K&R subscribes to

them – to set up variable interest rates – they left crucial terms out of their contracts.  If the

"Funding Bonds" are not the specific ones designated by MHFA – and the Type 2 notes

explicitly say that they are – then how does anyone determine what the Funding Bonds are for a

given note?  Are they the most recent bonds, or do they have to be traced in some manner to the

bonds originally designated as the Funding Bonds?  If so, who does the tracing and makes the

determination?  At what point after issuance of a new bond does the interest rate on a mortgage

loan change?  If K&R's interpretation was correct, these and other vital terms would be missing

and the contract would be incomplete.

**Type 3 Notes**

In addition to these two main types of notes, there is a third, catchall category of note:

those that memorialized substitute mortgages, mortgage increases, and the like, all of which

superseded prior mortgage notes.  These notes generally record the original mortgage loan and

one or more additional loan.  The notes set forth specific fixed interest rates for some or all of the loans they record.[7]

Where these notes state a specific interest rate, they supersede any prior notes.  The notes do not contain any language that would make those interest rates variable.  When a superseding note states a specific interest rate without qualification, that rate is fixed and cannot be affected by the 1993 refunder.  This is especially true for the handful of Type 3 notes that were executed after the 1993 bond issuance.

It is also worth mentioning that where these notes do state specific interest rates for old loans whose prior notes are being superseded, these rates are the same as would be found under the interpretation of the Type 1 and Type 2 notes that MHFA advances and that the Court has adopted.  In other words, when the parties added a new loan on top of existing ones, they explicitly stated the numerical interest rates on the prior loans, even though prior mortgage notes had simply set forth a formula for calculating those rates.  The numerical interest rates were consistent with the formula described by MHFA: they were pegged to specific bonds and had not varied once permanent financing was in place.  This shows that the parties to the notes agreed on the interest rate formula, ratified it on repeated occasions, and never saw fit to apply the contract interpretation advanced by K&R.  This course of performance is just one example of how clear the meaning of the notes is.

Other examples abound, primarily the fact that the parties to the 99 mortgage notes consistently interpreted them in the same way for 30 years.  On top of that, the entities that

---

[7]These notes sometimes do not explicitly state the interest rate on the most recent loan, but instead describe the method for calculating that interest rate in the same language used for the Type 2 notes.

appraised, insured, or purchased bonds under MHFA's 1993 bond issuance did so with the understanding that the mortgage notes, which secured the bonds, had fixed rates.  It would be a remarkable investor who would buy a bond that immediately and automatically impaired its own security by lowering interest on the mortgage notes that back the bonds.  And, of course, there is HUD, which consistently paid out the interest reduction payments claimed by MHFA, even after this suit was commenced.  K&R contends that all of these parties were wrong.  But to the contrary, they all readily saw what the Court sees: the mortgage notes set fixed interest rates once the projects went to permanent financing.  Any other interpretation of these notes is not supported by their language.

The Court holds that the mortgage notes at issue unambiguously established fixed interest rates.  Nothing in the contracts provides that these rates would be affected by bond issuances such as that in 1993.  "Contract language is ambiguous when it is reasonably prone to different interpretations," *Fowler v. Boise Cascade Corp.*, 948 F.2d 49, 54 (1st Cir. 1991), and the interpretation proffered by K&R is not reasonable.  But even if there were ambiguity in the terms of the mortgage notes, the Court would still be justified in granting summary judgment, because "[e]ven if there is ambiguity in the language . . . the evidence presented about the parties' intended meaning may be so one-sided that no reasonable person could decide the contrary." *Boston Five Cents Sav. Bank v. Sec'y of Dept. of HUD*, 768 F.2d 5, 8 (1st Cir. 1985).  MHFA has presented substantial evidence that the parties to the mortgage notes intended that they would set fixed interest rates and proceeded on the assumption that they did.  Indeed, had there been any ambiguous terms, the Court would have construed the notes the way it did to avoid the commercially unreasonable and absurd results that would follow from K&R's interpretation.

When a court must choose between two contract interpretations and the choice is "between an interpretation that would yield such a bargain as a reasonable person would have made and one that would not, the former is preferred." Farnsworth on Contracts § 7.11. The interpretation advanced by MHFA and adopted by the Court is one that reasonable parties would have agreed to, whereas K&R's is not. If the notes really had established variable interest rates that changed whenever MHFA's borrowing costs changed, this would give MHFA unilateral control over a crucial contract term. This is especially true since the bond applicable to a mortgage note supplies not only the interest rate but also affects the term. Under K&R's interpretation, MHFA could alter these components of the mortgage loan any time it wishes, as often as it wishes. If MHFA could obtain bonds at lower interest rates, it could unilaterally lower the cost of the mortgage loan to each project owner. But of course, MHFA would have little incentive to reduce its borrowing costs, because this would automatically reduce the mortgage loan interest rates and the concomitant HUD subsidies. MHFA would have little real incentive to obtain such savings because it would be forced to pass them all along, while at the same time bearing the substantial expense and risk of facilitating a bond issuance.

Of course, the flipside of this illogical arrangement is that there would be little to discourage MHFA from arbitrarily *raising* interest rates on the notes by issuing bonds with higher rates, since all of the costs would be foisted on the project owners and HUD. As a case in point, several of the notes in question had rates that were *lower* than those on the 1993 bonds, and by K&R's logic, those notes should have seen their interest rates automatically raised. Of course this did not happen, and K&R does not sue on those notes, but it offers no explanation as to why its variable-rate theory only applies when the rates vary in favor of project owners.

23

Also, as mentioned above, K&R posits that the redemption of bonds triggers an acceleration clause that makes the mortgage notes due and payable.  Again, this would create a highly unusual, indeed absurd scenario: MHFA would have the ability to call in its notes whenever it wants, simply by redeeming bonds.  Had the Court found any ambiguity in the contract, it would have avoided this unreasonable interpretation.  *See, e.g., Frigaliment Importing Co. v. B.N.S. Intl. Sales Corp.*, 190 F.Supp. 116 (S.D.N.Y. 1960) (avoiding unreasonable interpretation because buyer "must have expected [seller] to make some profit); *Langer v. Iowa Beef Packers*, 420 F.2d 365 (8th Cir. 1970) (courts reluctant to give "unreasonable or unfair interpretation" to a contract).  Especially troubling would be the total control this contract would give to one party, since a "contract will not be interpreted giving discretion to one party in a manner which would put one party at the mercy of another, unless the contract clearly requires such an interpretation."  *Iowa Fuel & Minerals v. Iowa State Bd. of Regents*, 471 N.W.2d 859 (Iowa 1991).  If the parties had actually agreed to such unusual, unreasonable contract provisions, they would have done so in clear terms.

All of the mortgage notes establish fixed, permanent rates.  When MHFA refunded its old bonds and issued new ones, this did not change any interest rates that were already fixed.  Therefore, the project owners continued to be obligated to make monthly payments in amounts calculated according to their mortgage notes.  Since nothing changed, MHFA's monthly claims for interest reduction payments were still calculated in accordance with the Interest Reduction payments, and the certifications in the Form HUD-3111s to that effect were true.  For that reason, there was no false claim, and MHFA is entitled to summary judgment.

## 2.    Intent

Even if the Court had held that MHFA incorrectly interpreted the terms of mortgage

contracts and therefore submitted false claims, it would still grant summary judgment to

defendant on the final prong of FCA liability, scienter.  K&R has not presented any actual

evidence of knowledge or intent to submit false claims on the part of MHFA.

The FCA imposes liability on anyone who "knowingly presents" a "false or fraudulent

claim."  31 U.S.C. § 3729(a).  A person acts "knowingly" if he:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).  The first element of "knowingly" goes after subjective knowledge,

while the second seeks out the kind of willful blindness from which subjective intent can be

inferred.  As for reckless disregard, it is "an extension of gross negligence," or "gross negligence-

plus," and is not merely a proxy for subjective intent.  *United States v. Krizek*, 111 F.3d 934,

942-43 (D.C. Cir. 1997); *see also United States ex rel. Mikes v. Straus*, 84 F.Supp. 2d 427, 439

(S.D.N.Y. 1999) (collecting authorities).  Mere negligence cannot support liability under the

FCA.  *Mikes*, 84 F.Supp. 2d at 439.  While scienter under the FCA is necessarily a "fact-

intensive inquiry," *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251

F.Supp. 2d 114, 120 (D.D.C. 2003), summary judgment is appropriate where plaintiff produces

no evidence sufficient to support a finding of the requisite scienter.  *See, e.g.*, John T. Boese,

CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 2.04(c)(1) (2d ed. 2000) ("To avoid

summary judgment for the defendant, admissible, credible evidence of a knowing false statement

is required.").  K&R points to four main areas in which it claims it has produced evidence, or identified genuine, material factual disputes, on the topic of intent.

First, K&R argues that MHFA engaged in a pattern of disregarding the plain language of the mortgage notes.  This is a bit of a tautology: since MHFA submitted *obviously* false claims, it obviously knew they were false.  This is assertion, not evidence.  It is further undercut by the fact that even if MHFA's interpretation of the notes was somehow incorrect, it was patently reasonable.  The fact that for 30 years every party to the notes interpreted them in the same way is proof positive that MHFA's interpretation, whether or not correct, was reasonable.  Intent cannot be inferred from the mere assertion that MHFA's interpretation of the notes was incorrect.  It is only where a "contractor's purported interpretation of the contract borders on the frivolous" and is "so plainly lacking in merit that the requisite state of mind can be inferred."  *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998).  If the only evidence a plaintiff submits is that claimant submitted a claim "based on a plausible but erroneous contract interpretation," then there can be no FCA liability "absent some specific evidence of knowledge that the claim is false or of intent to deceive."  *Id.*  Piling on the allegation that MHFA engaged in a pattern of such conduct does not help.  A pattern of nothing is still nothing.

Second, K&R asserts that MHFA had a motive to defraud HUD because of its precarious financial condition, and points to an alleged failure to follow generally accepted accounting principles for other programs, as well as alleged misrepresentations in financial statements for other programs.  Whatever MHFA's financial condition was, it sheds no light on MHFA's knowledge or intent.  There is no allegation that anyone profited personally from the savings under the 236 Program, and the assertion that MHFA employees were trying to save the Agency

from insolvency does not prove anything.  It is not disputed that MHFA sought the bond issuance to improve its financial condition.  The real issue is whether MHFA was entitled to keep the savings obtained thereby, and if it was not, whether MHFA knew that or recklessly disregarded the issue.  The presence of a motive cannot substitute for evidence of knowledge and intent.  Nor can the assertion of negligence or misconduct in other programs be considered probative in the absence of *any* evidence that MHFA acted knowingly or with reckless disregard in this case.

Third, MHFA allegedly failed to seek a legal opinion on the effect of the 1993 bond issuance on its existing mortgage notes.  K&R does not identify any duty on MHFA's part to do so.  Indeed, it is undisputed that a year prior to the issuance, MHFA sought and received an opinion from counsel on the same "interest rate pass-through" issue, which was consistent with MHFA's understanding of the issue as it applied to the 236 Program – namely, that changes to MHFA's borrowing costs did not dictate automatic changes in HUD subsidies, absent some specific directive.  At a later date, MHFA did seek advice from counsel, who confirmed that the earlier opinion applied with full force to the mortgage notes under the 236 Program.

Fourth, K&R asserts that MHFA should have sought HUD's opinion on the impact of the bond refunder.  Again, K&R does not identify any duty to do so.  If MHFA's "purported interpretation of the contract [had] border[ed] on the frivolous," it may have had a duty to "raise the interpretation issue with the government contracting officials or risk liability under the FCA." *Commercial Contractors*, 154 F.3d 1357, 1366.  But MHFA's contract interpretation was reasonable and did not raise the kind of red flags that might implicate such a duty to inquire.[8]

---

[8]For instance, a contract interpretation might be deemed "implausible in light of the unambiguous terms of the contract and other evidence," such as "repeated warnings" from a party to the contract or "the fact that the interpretation is contrary to well-established industry

Nor is this a case of reckless disregard, the kind of super-negligence found in cases like *Krizek*, where the defendant "failed utterly" to review bills submitted on its behalf, bills that were so patently false that "even the shoddiest recordkeeping would have revealed that false submissions were being made," *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997), or *Ervin*, where the defendants ignored and made no attempt to investigate obvious warning signs that their claims were false. *United States ex rel. Ervin & Assocs., Inc. v. The Hamilton Secs. Group, Inc.*, 370 F.Supp. 2d 18, 41-43 (D.D.C. 2005).

To the contrary, MHFA has presented substantial evidence that it acted in good faith when submitting its claims for interest reduction payments. For instance, when project owners who contracted with MHFA under different HUD programs raised the same issue – whether the 1993 bond refunder lowered their interest rates – MHFA consistently took the same position: that the bond refunder did not, without more, lower interest rates under the 236 Program or any other program.

Also, in the mid-1990s, MHFA reviewed its records for many projects, including those at issue in this case, and identified instances in which it overbilled, and also underbilled, in its invoices to HUD. MHFA brought these instances to HUD's attention, a clear sign of good faith.[9] During this process, HUD was made aware that the 1993 bond issuance had occurred and had not

_____

practice." *Commercial Contractors*, 154 F.3d at 1366.

[9]Interestingly, MHFA also discovered in the course of this review that several mortgages *were* affected by the 1993 bond refunder, because those mortgages had not yet been permanently financed. The 1993 bond refunder thus provided the first opportunity for permanent financing for those mortgages. The interest rates on the mortgages were then corrected to reflect the rate on the 1993 bonds, which were the funding bonds for those mortgages. This shows that MHFA was acting consistently with its interpretation of the interest provisions in the mortgage notes.

impacted most of the interest rates and interest reduction payments.  While the government's knowledge of the facts underlying a false claim does not necessarily shield the claimant from FCA liability, "[s]uch knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).  Finally, MHFA consistently applied the same interpretation of the notes over the course of three decades and across dozens of projects.  Consistent, good faith adherence to a reasonable interpretation of a contract or regulation over the course of many years is strong affirmative evidence that a defendant lacks the knowledge or intent required for FCA liability.  *See, e.g., United States ex rel. Rueter v. Sparks & Wiewel*, 939 F.Supp. 636 (C.D. Ill. 1996) (where contractor applied reasonable interpretation consistently for 25 years, evidence of knowledge or intent was insufficient for FCA liability).

## IV.    CONCLUSION

For the foregoing reasons, and in accordance with the previously issued Order [98], the Court holds that the Motions to Strike [90 & 93] are denied, plaintiff-relator's Motion for Summary Judgment [74] is denied, and defendant's Motion for Summary Judgment [75] is granted, judgment is entered against plaintiff-relator and in favor of defendant, and plaintiff-relator's complaint is dismissed with prejudice.

Signed by Royce C. Lamberth, United States District Judge, October 11, 2006.